**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**SCOTT ANTHONY MILLER,**

      **Plaintiff,**

**v.**                                           **Case No.: 3:15-cv-15503**

**CAROLYN W. COLVIN,
Acting Commissioner of the
Social Security Administration,**

      **Defendant.**

**<u>MEMORANDUM OPINION</u>**

This is an action seeking review of the decision of the Commissioner of the Social Security Administration (hereinafter the "Commissioner") denying Plaintiff's application for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The case is presently before the court on the parties' motions for judgment on the pleadings as articulated in their briefs. (ECF Nos. 11, 12). Both parties have consented in writing to a decision by the United States Magistrate Judge. (ECF Nos. 7, 8). The court has fully considered the evidence and the arguments of counsel. For the reasons that follow, the court **FINDS** that the decision of the Commissioner is not supported by substantial evidence, and therefore should be **REVERSED** and **REMANDED**, pursuant to sentence four of 42 U.S.C. § 405(g), for further proceedings consistent with this opinion.

## I.     Procedural History

In July 2012, Plaintiff Scott Anthony Miller ("Claimant") completed applications for DIB and SSI alleging a disability onset date of July 1, 2010 due to "Problems with back, neck and shoulders, learning disability." (Tr. at 188, 212). The Social Security Administration ("SSA") denied the applications initially and upon reconsideration. (Tr. at 101-10, 114-27). Claimant filed a request for a hearing, which was held on April 7, 2014 before the Honorable Toby J. Buel, Sr., Administrative Law Judge ("ALJ"). (Tr. at 27-71). By written decision dated May 13, 2014, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 11-21). The ALJ's decision became the final decision of the Commissioner on October 9, 2015 when the Appeals Council denied Claimant's request for review. (Tr. at 1-6).

On November 24, 2015, Claimant filed the present civil action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner filed an Answer and a Transcript of the Proceedings on January 27, 2016. (ECF Nos. 9,10). Thereafter, the parties filed their briefs in support of judgment on the pleadings. (ECF Nos. 11, 12). The time period for the filing of a reply has expired. Accordingly, this matter is fully briefed and ready for disposition.

## II.    Claimant's Background

Claimant was 38 years old at the time of his alleged onset of disability and 43 years old at the time of the ALJ's decision. (Tr. at 20, 188). He completed the 12th grade in special education classes and communicates in English. (Tr. at 33, 212, 321). Claimant previously worked as a golf course landscaper. (Tr. at 34-35, 213).

## III.   Summary of ALJ's Findings

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden

of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a five step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). First, the ALJ determines whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). Second, if the claimant is not gainfully employed, then the inquiry is whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). Third, if the claimant suffers from a severe impairment, the ALJ determines whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If the impairment does meet or equal a listed impairment, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). In the fourth step, the ALJ ascertains whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case

3

of disability and the burden shifts to the Commissioner to prove the final step. *McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). Under the fifth and final inquiry, the Commissioner must demonstrate that the claimant is able to perform other forms of substantial gainful activity, while taking into account the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger,* 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the ALJ "must follow a special technique" to assess disability. 20 C.F.R. §§ 404.1520a, 416.920a. First, the ALJ evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* §§ 404.1520a(b), 416.920a(b). If such impairment exists, the ALJ documents the findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in the regulations. *Id.* §§ 404.1520a(c), 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* §§ 404.1520a(d), 416.920a(d). A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1).

4

Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the degree of functional limitation against the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment that neither meets nor equals a listed mental disorder, then the ALJ assesses the claimant's residual functional capacity. 20 C.F.R. §§ 404.1520a(d)(3), 416.920a(d)(3).

In this case, the ALJ determined as a preliminary matter that Claimant met the insured status requirements of the Social Security Act through December 31, 2015. (Tr. at 13, Finding No. 1). The ALJ acknowledged that Claimant satisfied the first inquiry because he had not engaged in substantial gainful activity since July 1, 2010, the alleged disability onset date. (*Id.*, Finding No. 2). Under the second inquiry, the ALJ found that Claimant suffered from severe impairments of sprains/strains, all types, and borderline intellectual functioning. (Tr. at 13-14, Finding No. 3). Under the third inquiry, the ALJ concluded that Claimant's impairments, either individually or in combination, did not meet or medically equal any of the listed impairments. (Tr. at 14-15, Finding No. 4). Therefore, the ALJ determined that Claimant had the RFC to:

> [P]erform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he is limited to lifting and/or carrying 20 pounds occasionally and ten pounds frequently; standing and/or walking six hours out of an eight-hour workday; sitting six hours out of an eight-hour workday; and pushing/pulling to the weight limitations noted herein (Exhibit 5A). He should only lift with the right shoulder on an occasional basis. He should avoid concentrated exposure to extreme cold or heat, and hazards (moving machinery, unprotected heights, etc.). He can maintain concentration and attention for two-hours at a time.

(Tr. at 16-19, Finding No. 5). At the fourth step of the analysis, the ALJ determined that Claimant was unable to perform any past relevant work. (Tr. at 20, Finding No. 6).

Consequently, the ALJ considered Claimant's past work experience, age, and education in combination with his RFC to determine if he would be able to engage in substantial gainful activity. (Tr. at 20-21, Finding Nos. 7-10). The ALJ considered that (1) Claimant was born in 1971 and was defined as a younger individual on the alleged disability onset date; (2) he had at least a high school education and could communicate in English; and (3) transferability of job skills was not material to the ALJ's disability determination because Claimant's past relevant work was unskilled.  (Tr. at 20, Finding Nos. 7-9). Taking into account all of these factors, and Claimant's RFC, and relying upon the opinion testimony of a vocational expert ("VE"), the ALJ determined that Claimant could perform jobs that existed in significant numbers in the national economy. (Tr. at 20-21, Finding No. 10). At the light level, he could work as an edging machine feeder, bakery racker, or rover;[1] and at the sedentary level, Claimant could work as a grader/sorter, bench worker, and motor polarizer. (Tr. at 20-21). Therefore, the ALJ concluded that Claimant was not disabled as defined in the Social Security Act from July 1, 2010 through the date of the decision. (Tr. at 21, Finding No. 11).

## IV.    Claimant's Challenge to the Commissioner's Decision

Claimant presents several challenges to the Commissioner's decision. First, Claimant argues that the ALJ erred in finding that Claimant did not meet Listing 12.05C without first obtaining an additional psychological evaluation to resolve his inconsistent IQ scores. (ECF No.  11 at 5-6). Second, Claimant alleges that the ALJ erred in disregarding the VE's testimony that Claimant was incapable of substantial gainful activity if his impairments required him to take at least one extra break during the

---

[1] At the hearing held on April 7, 2014, the vocational expert referred to this job as a "groover, DOT 692.686-042." (Tr. at 69).

workday. (*Id.* at 6-7). Finally, Claimant argues that the ALJ improperly disregarded the consultative examiner's finding that he had markedly deficient persistence, as well as the VE's testimony that he would be incapable of substantial gainful activity if he had markedly deficient persistence. (*Id.* at 7).

In response to Claimant's arguments, the Commissioner states that Claimant has not proven that he is disabled under the Act, has not produced evidence that he meets or equals the requirements of Listing 12.05C, and has not demonstrated that he needed an additional break during the workday. (ECF No. 12 at 10-17).

## V.  **Relevant Medical Records**

The court has reviewed the transcript of proceedings in its entirety, including the treatment records and evaluations in evidence, and confines the following summary to those entries most relevant to the issues in dispute.

On March 28, 1979, Claimant was referred for a psychological evaluation based on the observations of his first grade teacher that Claimant could only work on a one-to-one basis and had "no memory for numbers or letters." (Tr. at 315-16). He was described as restless and unable to attend to the task at hand; his class work was described as "terrible with many errors when left to work independently." (Tr. at 315). Claimant was administered several tests by psychologist Diane C. Mufson, M.A., Department of Psychological Services, Cabell County Public Schools, and the results were confirmed by licensed counseling psychologist Michael J. Hughes, Ed.D. (Tr. at 315-16). On the Wechsler Intelligence Scale for Children-Revised ("WISC-R"), Claimant's full scale IQ score was 74, verbal IQ score was 75, and performance IQ score was 77. (Tr. at 315). These results placed him at the borderline of the Department of Mental Retardation's ("DMR") lowest end of average ability ranges. *Id.* Claimant's results on the Bender

7

Gestalt test, which measured perceptual ability, revealed that Claimant performed approximately two years below his age. (*Id.*). On the Wide Range Achievement Test ("WRAT"), which measured academic skills, Claimant received reading scores of kindergarten .7, spelling 1.o, and arithmetic 1.2, which indicated that he was at a grade equivalence less than his actual placement, with the greatest discrepancy in the area of reading. (Tr. at 316). The results of the evaluation indicated a need for additional learning disorder screening and educational evaluation, as well as consideration of DMR placement unless the learning disorder screening revealed specific areas that could best be remedied in a learning disorder classroom. (*Id.*).

While still in the Cabell County School System, Claimant was re-evaluated on December 11, 1985 for the purpose of compliance with Public Law 94-142. (Tr. at 317-18). Claimant scored within the educable mentally impaired range of intellectual ability on the WISC-R. (Tr. at 319). The Bender-Gestalt results suggested a level of visual motor coordination commensurate with Claimant's overall intellectual ability. (*Id.*). Claimant scored a verbal IQ of 67, performance IQ of 77 and an overall full scale IQ of 70. (Tr. at 320). The administering psychologist found that Claimant easily interacted with him and was personable. (Tr. at 321). Claimant's performance abilities were found to be better developed than his verbal abilities, albeit not significantly. (*Id.*). Tests results also indicated that Claimant had a history of behavioral problems at school. (*Id.*). Based on the results and available information, behavior management strategies were recommended, along with continued instruction in the program for educable mentally impaired students. (*Id.*).

Claimant was re-evaluated again on November 18, 1988 by Kenneth R. Mobley, M.A., and Psychologist William Given, West Virginia Division of Rehabilitation Services,

for the purpose of determining his eligibility for rehabilitation services and vocational counseling. (Tr. at 312-14). He was 16.9 years old and in the 11th grade. (Tr. at 312). On the Wechsler Adult Intelligence Scale-Revised ("WAIS-R"), Claimant scored a verbal IQ of 73, a performance IQ of 76 and a full scale IQ of 74. (Tr. at 312). These scores placed Claimant in the borderline range of intellectual functioning. (Tr. at 313). The WRAT-R test used to evaluate academic skills revealed that Claimant's reading recognition and reading comprehension fell far below average. (*Id.*).  The examiners felt the test results were an adequate representation of Claimant's level of functioning. (Tr. at 312).

At the time of this evaluation, Claimant was enrolled in the building and maintenance curriculum at the Cabell County Vocational Technical Center. Claimant informed the examiners that he did not like the curriculum; however, it was determined that training options for Claimant were limited due to his low level of ability and impaired academic skills. (Tr. at 314). The examiners opined that Claimant would be best suited to programs that involved oral instructions and direct hands-on experience; however, once Claimant learned basic job skills, he would most likely require very little supervision on the job site. (*Id.*).

Many years later, on October 17, 2012, Claimant underwent psychological testing as an adult in connection with his present applications for Social Security benefits. (Tr. at 281-85). Lisa Tate, M.A., completed a Mental Status Examination and observed that although Claimant demonstrated some articulation errors, his speech production was easy to understand. (Tr. at 281). Claimant reported that he graduated from high school in 1990, but stated that he had a lifelong learning disability and was enrolled in special education classes. (Tr. at 282). He stated that he repeated the fifth grade, but was then promoted directly to the seventh grade. (*Id.*). He also stated that he required assistance

in reading his mail and that his wife managed the household finances. (*Id.*).

On examination, Claimant was oriented to person, place, time, and date. (Tr. at 283). His thought processes and content were within normal limits, his insight was fair, but his judgment was markedly deficient based upon his response to the "finding the letter" question. (*Id.*). Claimant's immediate and remote memory were within normal limits; however, his recent memory was deemed mildly deficient as he could only recall two out of four words after a thirty-minute lapse. (*Id.*). Claimant's concentration and psychomotor behavior were normal. (*Id.*).

Ms. Tate administered the WAIS-IV test, which revealed a full scale IQ of 51; however, Ms. Tate opined that the results were invalid due to Claimant's apparent disinterest in testing, his tendency to give up easily on tasks, his slow work pace, his need for constant encouragement, and the lack of satisfactory rapport between Claimant and the tester. (Tr. at 284). On the WRAT-4 test, Claimant received a score of 56 in reading and 55 for spelling and math. (*Id.*). These scores were likewise deemed invalid for the same reasons. (*Id.*).

Claimant described that he spent a typical day sitting and watching television. (*Id.*). He showered and washed dishes once a week and grocery shopped once a month. His only reported hobby was watching football games on television. (*Id.*). Ms. Tate found Claimant's social functioning to be mildly deficient based upon his interaction with staff during the evaluation. (Tr. at 285). Claimant's concentration and pace were within normal limits; however, his persistence was markedly deficient based on clinical observation. (*Id.*). Due to the invalid IQ scores, Ms. Tate was unable to reach a diagnostic impression. (Tr. at 284).

On November 15, 2012, Jim Capage, Ph.D., completed a Case Analysis after

reviewing Ms. Tate's report. (Tr. at 75-76). Dr. Capage noted that Claimant alleged a learning disability and reported that he could not read or write; however, during Ms. Tate's evaluation, Claimant did not appear to show any effort, which caused Ms. Tate to consider his test scores invalid. (Tr. at 76). Given Claimant's failure to cooperate in his consultative examination, Dr. Capage found Claimant's credibility to be "suspect." (*Id.*). Ultimately, Dr. Capage found that the evidence was insufficient to adjudicate the claim. (*Id.*). The above findings were affirmed by Timothy Saar, Ph.D., on January 14, 2013. (Tr. at 85-86). Dr. Saar completed a Case Analysis and found no new allegations, no new treatment, and no new sources. He reiterated that there was insufficient evidence to adjudicate the claim. (*Id.*).

## VI.    Scope of Review

The issue before this Court is whether the final decision of the Commissioner denying Claimant's application for benefits is supported by substantial evidence. The Fourth Circuit has defined substantial evidence as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the administrative law judge, not the court, is charged with resolving conflicts in the evidence. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). The Court will not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Id.* Instead, the Court's duty is limited in scope; it must adhere to its "traditional function" and "scrutinize the record as a whole to determine whether the conclusions reached are rational." *Oppenheim v.*

*Finch*, 495 F.2d 396, 397 (4th Cir. 1974). Thus, the ultimate question for the Court is not whether the Claimant is disabled, but whether the decision of the Commissioner that the Claimant is not disabled is well-grounded in the evidence, bearing in mind that "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner]." *Walker v. Bowen,* 834 F.2d 635, 640 (7th Cir. 1987).

## VII.   Analysis

### A.   The ALJ's Analysis of Claimant's IQ Under Listing 12.05C

In his first challenge to the Commissioner's decision, Claimant argues that his combination of physical and mental impairments satisfy Listing 12.05C. (ECF No. 11 at 5). Claimant contends that substantial evidence before the ALJ supported a step three finding in his favor; therefore, contradictory evidence in the record should have been more thoroughly considered and reconciled by the ALJ. Specifically, Claimant asserts that the ALJ should have ordered an additional psychological examination to resolve inconsistencies in his IQ scores; particularly, as the ALJ made his step three determination based largely upon those scores. (*Id.* at 6).

A claimant should be found disabled at the third step of the sequential evaluation process when his or her impairments meet or medically equal an impairment included in the Listing. The Listing describes "for each of the major body systems, impairments which are considered severe enough to prevent a person from doing any gainful activity." *See* 20 C.F.R. § 404.1525. The Listing is intended to identify those individuals whose mental or physical impairments are so severe that they would likely be found disabled regardless of their vocational background; consequently, the criteria defining the listed impairments is set at a higher level of severity than that required to meet the statutory

12

definition of disability. *Sullivan v. Zebley*, 493 U.S. 521, 532, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990). Because disability is presumed with a listed impairment, "[f]or a claimant to show that his impairment matches a [listed impairment], it must meet all of the specified medical criteria." *Id.* at 530. The claimant bears the burden of production and proof at this step of the disability determination process. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Section 12.00 of the Listing pertains to mental disorders, which are arranged in nine diagnostic categories, including listing 12.05 for intellectual disability (formerly mental retardation). 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.00. According to the regulations:

> The structure of the listing for intellectual disability (12.05) is different from that of the other mental disorders listings. Listing 12.05 contains an introductory paragraph with the diagnostic description for mental retardation. It also contains four sets of criteria (paragraphs A through D). If [a claimant's] impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria, [the SSA] will find that [the] impairment meets the listing.

*Id.* Thus, to qualify for disability under listing 12.05C, Claimant must establish that he has an intellectual impairment that satisfies both the diagnostic description and the severity criteria outlined in paragraph C. The diagnostic description of intellectual disability, sometimes called the first prong of the listing, is "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period, i.e., the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R. Part 404, Subpart P, App'x 1 § 12.05. The severity criteria contained in paragraph C, which constitutes the second prong of the listing, is: "A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related

limitation of function." *Id.* at § 12.05C.

In the introduction to Section 12.00, the SSA explains that "[s]tandardized intelligence test results are essential to the adjudication of all cases of intellectual disability that are not covered under the provisions of 12.05A." 20 C.F.R. Part 404, Subpart P, App'x 1 § 12.00. However, "since the results of intelligence tests are only part of the overall assessment, the narrative report that accompanies the test results should comment on whether the IQ scores are considered valid and consistent with the developmental history and the degree of functional limitation." *Id.* Furthermore, when "considering the validity of a test result, [the ALJ] should note and resolve any discrepancies between formal test results and the individual's customary behavior and daily activities." *Id.* In general, the results obtained by a licensed psychologist following administration of accepted intelligence tests are entitled to considerable weight in Social Security cases, but the ALJ is not required to accept such scores. *See Clark v. Apfel,* 141 F.3d 1253, 1255 (8th Cir. 1998); *see also Craig v. Chater,* 76 F.3d 585, 589 (4th Cir. 1996); *Coffman v. Bowen,* 829 F.2d 514, 517 (4th Cir. 1988); *Foster v. Heckler,* 780 F.2d 1125, 1130 (4th Cir. 1986). The ALJ may reject IQ scores if they are inconsistent with other substantial evidence in the record, such as conflicting professional opinions, or other evidence indicating that the claimant historically achieved higher scores or has more advanced functional capacities than would be expected from someone with a below-average IQ. *Clark*, 141 F.3d at 1255; *see also Hancock v. Astrue*, 667 F.3d 470, 474 (4th Cir. 2012) ("[A]n ALJ has the discretion to assess the validity of an IQ test result and is not required to accept it even if it is the only such result in the record."). Indeed, IQ test results must be examined "to assure consistency with daily activities and behavior." *Popp v. Heckler,* 779 F.2d 1497, 1499

(11th Cir. 1986). The question is "whether the decision to disregard the scores as unreliable is supported by substantial evidence from the record as a whole." *Pogue v. Astrue,* 692 F. Supp.2d. 1088  (E.D. Mo. 2010).

Here, the ALJ considered the severity of Claimant's intellectual impairment at steps two and three of the sequential evaluation. The ALJ referenced the psychological testing administered to Claimant in 1988 when he was 16.9 years old and in the 11th grade. (Tr. at 13). The test results confirmed that Claimant was functioning in the borderline intellectual range, with a verbal IQ score of 73, a performance IQ score of 76, and a full scale IQ score of 74. (Tr. at 313). The ALJ noted that the results of the 1988 testing were consistent with a prior IQ test performed in 1979, which reflected a verbal IQ score of 75, a performance IQ score of 77, and a full scale IQ score of 74. (Tr. at 13, 315). The ALJ acknowledged that the IQ scores from Claimant's October 2012 testing administered by consultative examiner, Lisa Tate, were markedly lower than Claimant's previous scores, but emphasized that Ms. Tate rejected the results as invalid. (Tr. at 13). Consequently, the ALJ found at step two that, notwithstanding Claimant's 2012 scores, he was functioning "at least in the borderline range." (Tr. at 13-14).

At step three of the process, the ALJ compared the evidence regarding Claimant's intellectual functioning with the criteria of Listing 12.05 and explained why Claimant did not meet the severity criteria outlined in any of the four paragraphs of the listing. Specifically, with respect to paragraph C, the ALJ stated that Claimant did not have "a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or mental impairment imposing an additional and significant work-related limitation of function." (Tr. at 14). The ALJ again cited to Claimant's psychological testing from 1988, indicating that the IQ scores obtained at that time were considered valid "although limited by his

low levels of ability and impaired academic skills." (Tr. at 15). The ALJ once again rejected the lower scores returned in 2012, reiterating that although the scores were 65 and below, Ms. Tate found the results to be invalid based on a number of factors, including Claimant's disinterest in testing, his slow pace and tendency to give up easily, and the lack of a satisfactory rapport between Claimant and his tester. (Tr. at 14).

Having reviewed the evidence and the ALJ's discussion, the undersigned finds no error in the ALJ's step three assessment of Claimant's intellectual functioning. As shown above, the ALJ acknowledged the inconsistency in Claimant's IQ scores, reconciled the differences, and clearly articulated his rationale for rejecting the lower scores. Moreover, the ALJ's determination that Claimant could not satisfy the second prong of Listing 12.05C is supported by substantial evidence.

On two occasions, Claimant had IQ scores that were 70 or below. First, in 1985, when Claimant was approximately fourteen years old, his verbal IQ score was 67, his performance IQ score was 77, and his full scale IQ was 70. (Tr. at 320). Second, in October 2012, he received scores ranging from 50 to 65 on the five scales of the WAIS-IV. (Tr. at 283). However, neither set of scores was valid under the Listing. With respect to the 1985 scores, Claimant's young age made the scores reliable for only a limited period of time. As stated in the regulations, IQ testing results tend to stabilize by the age of 16; consequently, test results that measure 40 or above and are obtained before the age of 16 (between ages 7 and 16) are valid indicators of an individual's intellectual functioning for only two years. 20 C.F.R. pt 404, subpt. P, App. 1, § 112.00(D)(10). Therefore, Claimant's 1985 results were only valid through 1987. In 1988, after Claimant had turned 16 years of age, he was retested, and this time all of his scores were above 70. Moreover, these scores were consistent with Claimant's earlier testing in 1979, casting

16

doubt on the reliability of the 1985 scores.

Likewise, it was appropriate for the ALJ to reject the 2012 scores. Not only were the scores deemed invalid by the psychologist who administered the test, but the results were entirely inconsistent with Claimant's 1988 scores and the level of functioning displayed by Claimant. As stated by the Fourth Circuit, "the Secretary's regulation 'expressly define[s] mental retardation as denoting 'a lifelong condition.'" *Branham v. Heckler,* 775 F.2d 1271, 1274 (4th Cir. 1985). Therefore, "in the absence of any evidence of a change in a claimant's intelligence functioning, it must be assumed that the claimant's IQ had remained relatively constant." *Luckey v. U.S. Dep't of Health & Human Servs.,* 890 F.2d 666, 668 (4th Cir. 1989) (citing *Branham,* 775 F.2d at 1274). There was no evidence that Claimant suffered trauma, illness, or any other event that would explain a precipitous drop in his intellectual functioning from the level measured at age 16.9. Therefore, the ALJ appropriately rejected Claimant's 2012 IQ scores. (Tr. at 13-14).

Further, it was proper for the ALJ not to order a second consultative examination given that the record contained valid IQ scores that were obtained after Claimant's sixteenth birthday. Claimant's 1988 scores were all above 70 and were found by the ALJ to be consistent with other evidence regarding Claimant's educational background, past work history, daily activities, and level of functioning. (Tr. at 19, 312-14). In addition, the psychologists from the West Virginia Division of Rehabilitation, who were evaluating Claimant's need for services and vocational counseling, concluded that Claimant's intellectual functioning was at the borderline range. They added that despite having academic skills "significantly below his level of ability," Claimant was capable of learning basic job duties and, after learning them, would require little supervision on the job site.

(Tr. at 314).

Thus, the ALJ relied on valid IQ scores in accordance with the applicable regulations when he determined that Claimant's IQ did not fall between 60 and 70 as required by Listing 12.05C. Consequently, there was no compelling reason for the ALJ to order a second consultative examination. *See Pollard v. Comm'r of Soc. Sec.*, No. 1:10-CV-714, 2012 WL 95426, at *5 (S.D. Ohio Jan. 12, 2012) ("In this case, there existed substantial evidence in the record to determine that Plaintiff did not meet the threshold diagnosis of mental retardation and therefore could not satisfy the criteria of Listings 12.05(B) or 12.05(C). As detailed above, the record does not contain any opinion evidence suggesting that Plaintiff suffers from mental retardation nor does it contain evidence of significantly subaverage intellectual functioning. Accordingly, the ALJ was under no duty to order additional intelligence testing.") (citing *Hayes v. Comm'r of Soc. Sec.,* 357 F. App'x 672, 675 (6th Cir. 2009)). In sum, the court finds that the ALJ clearly articulated his analysis of Claimant's IQ scores and properly concluded that Claimant's intellectual impairment did not meet Listing 12.05C.

## B. <u>The ALJ's Analysis of Claimant's Persistence and Judgment</u>

Claimant's second and third challenges to the Commissioner's decision involve the ALJ's decision to disregard testimony by the VE that Claimant would be incapable of maintaining substantial gainful employment if he required an extra break during the work day, or had markedly deficient persistence. (ECF No. 11 at 6-7). Claimant points to findings made by Ms. Tate during the consultative examination establishing Claimant's markedly deficient judgment and persistence. In light of these findings, Claimant argues that "it is reasonable to assume that [he] would need at least one (1) extra break, and probably more, during the workday." (*Id.* at 7).

In his written decision, the ALJ found that Claimant had moderate difficulty with concentration, persistence, or pace. (Tr. at 15). To explain this finding, the ALJ noted that Claimant "enjoys watching football on television, a 60-minute program, and keeps track of the game off and on" and also "watches television throughout the day, whatever is on at the time." (*Id.*). In assessing Claimant's RFC, the ALJ again referenced that Claimant "could sit and watch a football game that runs 60 minutes or longer." (*Id.* at 16). Therefore, the ALJ determined that Claimant could maintain concentration and attention for two hours at a time. (*Id.* at 19).

When questioning the VE, the ALJ described a hypothetical individual that was able to "maintain attention and concentration for two hour increments." (Tr. at 68). Assuming that level of attention and concentration, the VE testified that the hypothetical individual could perform work found in significant numbers in the national economy. (*Id.* at 68-69). The VE's opinion changed to the negative, however, if the individual also required an extra break during the work day. (*Id.* at 69). In addition, when Claimant's attorney asked the VE to assume that the hypothetical individual was "markedly deficient in their [*sic*] persistence skills," the VE testified that the hypothetical individual would not be able to work. (Tr. at 70). Accordingly, when evaluating the ALJ's decision, key considerations include (1) whether the ALJ's finding of a moderate, rather than marked, deficit in persistence is supported by substantial evidence and (2) whether the limitation in concentration and attention contained in the RFC finding adequately accounts for Claimant's reduced persistence.

While the ALJ provided some rationale for his finding that Claimant had only a moderate limitation in persistence, the explanation given—that Claimant watched television throughout the day and kept track of football games "off and on" that lasted

19

60 minutes or longer—is so lacking in analysis that it is perplexing. Moreover, Claimant's ability to watch a 60-minute television program does not provide a clear nexus to the ALJ's determination that Claimant could maintain concentration and attention for two hours at a time. *See, e.g., Burrow v. Colvin*, No. 1:15CV163, 2016 WL 1258840, at *5 (M.D.N.C. Mar. 28, 2016) ("There should be "a logical bridge[ ] between the ALJ's conclusion that Plaintiff suffered moderate concentration deficits" and the limitations in the RFC.") (citations omitted). Indeed, even assuming that Claimant paid attention to the television "off and on" and for 60-minute programs, the ALJ never explained how that ability translated into the capacity to maintain concentration and attention, uninterrupted, for *two-hour* increments. Thus, the ALJ's observations regarding Claimant's ability to watch television do not clearly reconcile with or provide sufficient support for his finding that Claimant had moderately deficient persistence, which could be functionally addressed by limiting the requisite periods of concentration and attention to two-hour increments.

Furthermore, and very importantly, the ALJ did not distinguish, discount, reject, or even mention Ms. Tate's findings that Claimant had markedly deficient judgment and persistence. (Tr. at 283, 285). Due the ALJ's lack of explanation, the court is left to speculate whether the ALJ considered Ms. Tate's findings, and, if the ALJ rejected them, why he did so. As previously stated, the ALJ discussed Claimant's "significant lack of effort" during the consultative examination and repeatedly referenced Ms. Tate's opinion that Claimant's intellectual functioning test results were invalid. (Tr. at 13, 14, 18-19). However, the ALJ does not provide any discussion or explanation for rejecting Ms. Tate's other opinions. Ms. Tate raised doubts only about the validity of Claimant's IQ test results, not about her other clinical observations and findings. While the ALJ

may have discounted Ms. Tate's opinion that Claimant had markedly deficient judgment and persistence based on Claimant's lack of effort during testing, or for other reasons, the ALJ never supplied a reason in his decision. As the ALJ failed to sufficiently articulate his analysis, the court is precluded from meaningfully reviewing whether the RFC finding and subsequent determination regarding Claimant's ability to work are supported by substantial evidence.

"Judicial review of a final decision regarding disability benefits under the Social Security Act, 42 U.S.C. §§ 301 *et seq.* (the "Act"), is limited to determining whether the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). "Ultimately, it is the duty of the administrative law judge reviewing a case, and not the responsibility of the courts, to make findings of fact and to resolve conflicts in the evidence. *Id.* The court cannot re-weigh the evidence and provide the analysis that the ALJ should have performed in the first instance. *See Fox v. Colvin,* 632 F. App'x 750, 754 (4th Cir. 2015). Therefore, this action must be remanded to the Commissioner for further analysis and explanation regarding Claimant's judgment and persistence and its effect on his ability to engage in substantial gainful activity.

## VIII.  Conclusion

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision is not supported by substantial evidence. Therefore, the Court will **GRANT** Plaintiff's motion for judgment on the pleadings, to the extent that it requests remand, (ECF No. 11); **DENY** Defendant's motion for judgment on the pleadings, (ECF No. 12); **REVERSE** the final decision of the Commissioner; **REMAND** this matter pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative

proceedings consistent with this opinion; and **DISMISS** this action from the docket of the Court. A Judgment Order will be entered accordingly.

The Clerk of this Court is directed to transmit copies of this Memorandum Opinion to counsel of record.

**ENTERED:**  January 6, 2017

Cheryl A. Eifert
United States Magistrate Judge